**No. 25-50975**

---

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

---

**Jameka Eleazer,**

***Plaintiff - Appellant,***

**v.**

**Oracle America, Inc.,**

***Defendant - Appellee.***

Appeal from the United States District Court for the
Western District of Texas, Austin Division,
Case No. 1:24-CV-00777-RP
Honorable Robert Pitman, United States District Judge

---

# BRIEF OF APPELLEE

---

Edward M. "Ted" Smith
Texas Bar No. 00791682
tsmith@cornellsmith.com
Sarah E. Lancaster
Texas Bar No. 24092663
slancaster@cornellsmith.com
**CORNELL SMITH MIERL BRUTOCAO BURTON LLP**
1607 West Avenue
Austin, Texas 78701
512.328.1540

Sara E. Janes
Texas Bar No. 24056551
sjanes@weisbartspringer.com
**WEISBART SPRINGER STORM HATCHITT, LLP**
212 Lavaca Street, Suite 200
Austin, Texas 78701
512.652.5780
512.682.2074 fax

**ATTORNEYS FOR APPELLEE**

# CERTIFICATE OF INTERESTED PERSONS

**No. 25-50975**

***Jameka Eleazer v. Oracle America, Inc.***

Pursuant to Fifth Circuit Rule 28.2.1, the undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

| Interested Parties | Description of Interest |
|---|---|
| Jameka Eleazer | Plaintiff–Appellant |
| Matt Bachop<br>Texas Bar No. 24055127<br>mbachop@ddollaw.com<br>DEATS DURST & OWEN, PLLC | Trial and Appellate Counsel for Plaintiff–Appellant |
| Oracle America, Inc. | Defendant–Appellee |
| Edward M. "Ted" Smith<br>Texas Bar No. 00791682<br>tsmith@cornellsmith.com<br>Sarah E. Lancaster<br>Texas Bar No. 24092663<br>slancaster@cornellsmith.com<br>CORNELL SMITH MIERL BRUTOCAO BURTON LLP | Trial and Appellate Counsel for Defendant–Appellee |
| Sara E. Janes<br>Texas Bar No. 24056551<br>WEISBART SPRINGER STORM HATCHITT, LLP | Appellate Counsel for Defendant–Appellee |

| | |
|---|---|
| Oracle Corporation | Parent Company of Defendant–Appellee Oracle America, Inc. |

Oracle America, Inc. is a Delaware corporation wholly owned by Oracle Corporation, its parent corporation. Oracle Corporation is a publicly held corporation owning 10% or more of Oracle America, Inc. stock.

Dated: June 12, 2026

/s/ *Sara E. Janes*
Sara E. Janes
Texas Bar No.24056551
sjanes@weisbartspringer.com
**WEISBART SPRINGER STORM HATCHITT, LLP**
212 Lavaca Street, Suite 200
Austin, Texas 78701
512.652.5780
512.682.2074 fax

Edward M. "Ted" Smith
Texas Bar No. 00791682
tsmith@cornellsmith.com
Sarah E. Lancaster
Texas Bar No. 24092663
slancaster@cornellsmith.com
**CORNELL SMITH MIERL BRUTOCAO BURTON LLP**
1607 WEST AVENUE
AUSTIN, TEXAS 78701
512.328.1540

**ATTORNEYS FOR APPELLEE ORACLE AMERICA, INC.**

## STATEMENT REGARDING ORAL ARGUMENT

Oracle agrees with Eleazer that oral argument is not necessary. The facts and legal arguments are adequately presented in the briefs and the relatively small record, and the decisional process would not be significantly aided by oral argument. FED. R. APP. 34(a)(1)(C).

# TABLE OF CONTENTS


Certificate of Interested Persons .......... ii

Statement Regarding Oral Argument .......... iv

Table of Contents .......... v

Table of Citations .......... viii

Statement of the Issues .......... xii

Brief of Appellee Oracle America, Inc. .......... 1

I. Statement of the Case .......... 3

A. Eleazer's employment is terminated for low performance. .......... 3

1. Eleazer's performance review for the 2022 Fiscal Year was "Needs Improvement." .......... 4

2. Eleazer gets a new manager who also notices performance deficiencies. .......... 6

3. Eleazer is placed on a PIP .......... 8

4. Eleazer's performance does not significantly improve. .......... 11

5. Eleazer's performance is not "average;" she ranks at the bottom of her team. .......... 13

6. Eleazer's employment is terminated for unsatisfactory performance. .......... 16

B. Eleazer files a charge with the EEOC complaining of race discrimination. .......... 16

C. The district court grants summary judgment in Oracle's favor. 17

II. Summary of Argument .......... 19

III. Argument .......... 21

A. Standard of review. .......... 21

B. The district court correctly granted summary judgment on Eleazer's discrimination claim. *(Oracle issue 1, Eleazer issue 1)* 23

1. There is no evidence to support the fourth element of Eleazer's prima facie case, i.e., that Eleazer was treated less

favorably than other similarly situated employees outside her protected group. (*Oracle issue 1.a, Eleazer issue 1*) ....... 25

a. Eleazer was terminated for a combination of reasons, three of which Eleazer did not address below. ............... 27

b. Eleazer has forfeited the opportunity to challenge the pipeline numbers, as she did not even mention them below. ........ 29

c. Eleazer's sales attainment was not nearly identical to most of the members of her team, and it cannot be viewed in a vacuum. ........ 31

d. Eleazer relies on unsworn, unauthenticated, hearsay that still does not provide evidence of a similarly situated comparator. ........ 33

e. Eleazer's complaints of other alleged discriminatory treatment fail for the same reason: Eleazer has not identified an appropriate comparator. ........ 37

2. Eleazer provided no evidence that Oracle's legitimate, nondiscriminatory reasons for terminating Eleazer's employment were pretextual. (*Oracle issue 1.b, not addressed by Eleazer*) ........ 39

a. Oracle met its burden of production and showed Eleazer was terminated for a legitimate, nondiscriminatory reason: her unsatisfactory performance. ........ 40

b. Eleazer presented no evidence of pretext. ........ 40

C. The district court correctly granted summary judgment on Eleazer's retaliation claim. (*Oracle issue 2, Eleazer's issue 2*) 43

1. Eleazer provided no evidence that Oracle's legitimate, nonretaliatory reasons for terminating Eleazer's employment were pretextual. (*Oracle issue 2.a, not addressed by Eleazer*) ........ 43

a. Oracle met its burden of production and showed Eleazer was terminated for a legitimate, nonretaliatory reason. 44

b. Eleazer presented no evidence of pretext. ........ 45

2. Eleazer failed to exhaust her administrative remedies when she failed to include a retaliation claim in her EEOC charge. *(Oracle issue 2.b, Eleazer issue 2)* ........ 45

Conclusion and Prayer ........ 50

Certificate of Service ........ 51

Certificate of Compliance ........ 52

# TABLE OF CITATIONS

**Cases**

*Alkhawaldeh v. Dow Chem. Co.*,
851 F.3d 422 (5th Cir. 2017) .......... 26

*Awe v. Harris Health Sys.*,
163 F.4th 969 (5th Cir. 2026) .......... 21

*Balboa Capital Corp. v. Okoji Home Visits MHT, L.L.C.*,
111 F.4th 536 (5th Cir. 2024) .......... 34

*Bassett v. Gray Media Grp., Inc.*,
No., 25-60278, 2026 U.S. App. LEXIS 14803
(5th Cir. May 22, 2026) .......... 24

*Begolli v. Home Depot U.S.A., Inc.*,
701 F.3d 1158 (7th Cir. 2012) .......... 48

*Bunker v. Dow Chem. Co.*,
111 F.4th 683 (5th Cir. 2024) .......... 45

*Burton v. Freescale Semiconductor, Inc.*,
798 F.3d 222 (5th Cir. 2015) .......... 40

*Byers v. Dall. Morning News, Inc.*,
209 F.3d 419 (5th Cir. 2000) .......... 22

*Cambric v. City of Corpus Christi*,
170 F.4th 321 (5th Cir. 2026) .......... 29, 30

*Campos v. Steves & Sons, Inc.*,
10 F.4th 515 (5th Cir. 2021) .......... 34

*Clarkston v. White*,
943 F.3d 988 (5th Cir. 2019) .......... 23, 39

*Ernst v. Methodist Hospital System*,
1 F.4th 333 (5th Cir. 2021) .......... 47, 48, 49

*Feist v. La., Dep't of Just., Off. of the Atty. Gen.*,
730 F.3d 450 (5th Cir. 2013) .......... 40

*Hall v. Continental Airlines, Inc.*,
252 F. App'x 650 (5th Cir. 2007) .......... 45

*Hamilton v. Dall. Cty.*,
79 F.4th 494 (5th Cir. 2023) .......... 38

*Horton v. CCA Props. Of Am., LLC,*
No., 12-20404, 2013 U.S. App. LEXIS 9358
(5th Cir. May 8, 2013) .......... 46, 47

*Kolpakchi v. Principi*,
113 F. App'x 633 (5th Cir. 2004) .......... 23

*Lee v. Kansas City S. Ry. Co.*,
574 F.3d 253 (5th Cir. 2009) .......... 19, 25, 26, 27

*LeMaire v. La. Dep't of Transp. & Dev.*,
480 F.3d 383 (5th Cir. 2007) .......... 30, 42, 44

*Likens v. Hartford Life & Accident Ins. Co.*,
688 F.3d 197 (5th Cir. 2012) .......... 22, 31

*Lindsey v. Sears Roebuck & Co.*,
16 F.3d 616 (5th Cir. 1994) .......... 22

*Little v. Republic Ref. Co.*,
924 F.2d 93 (5th Cir.1991) .......... 43

*McClain v. Lufkin Industries, Inc.*,
519 F.3d 264 (5th Cir. 2008) .......... 45, 46

*McCoy v. City of Shreveport*,
492 F.3d 551 (5th Cir. 2007) .......... 25

*McDonnell Douglas Corp. v. Green*,
411 U.S. 792 (1973) .......... 24

*Morris v. Covan World Wide Moving, Inc.*,
144 F.3d 377 (5th Cir. 1998) .......... 22

*Oncale v. Sundowner Offshore Servs., Inc.*,
523 U.S. 75 (1998) .......... 38

*Outley v. Luke & Assocs.*,
840 F.3d 212 (5th Cir. 2016) .......... 43, 44

*Owens v. Circassia Pharm., Inc.*,
33 F.4th 814 (5th Cir. 2022) .......... 38, 41

*Patton v. Jacobs Eng'g Grp., Inc.*,
874 F.3d 437 (5th Cir. 2017) .......... 48

*Preston v. TDFPS*,
222 F. App'x 353 (5th Cir. 2007) .......... 49, 47

*Price v. Fed. Express Corp.*,
283 F.3d 715 (5th Cir. 2002) .......... 41

*Reeves v. Sanderson Plumbing Prods.*,
530 U.S. 133 (2000) .......... 23, 24

*Runnels v. Tex. Children's Hosp. Select Plan*,
167 F. App'x 377 (5th Cir. 2006) .......... 27, 28

*Saketkoo v. Adm'rs of Tulane Educ. Fund*,
31 F.4th 990 (5th Cir. 2022) .......... 23, 24

*Sanchez v. Standard Brands, Inc.*,
431 F.2d 455 (5th Cir. 1970) .......... 46, 49, 47

*Shackelford v. Deloitte & Touche, LLP*,
190 F.3d 398 n.2 (5th Cir. 1999) .......... 23

*Standley v. Rogers*,
680 F. App'x 326 (5th Cir. 2017) .......... 36, 37

*Stelly v. Dep't of Pub. Safety & Corr. La. State*,
149 F.4th 516 (5th Cir. 2025) .......... 22

*Taylor v. Books A Million, Inc.*,
296 F.3d 376 (5th Cir. 2002) .......... 46

*Tex. Commer. Energy v. TXU Energy, Inc.*,
413 F.3d 503 (5th Cir. 2005) .......... 29

*Texas Dep't of Cmty. Affairs v. Burdine*,
450 U.S. 248 (1981) .......... 24

*Turner v. Baylor Richardson Med. Ctr.*,
476 F.3d 337 (5th Cir. 2007) .......... 24

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
570 U.S. 338 (2013) .......... 44

*Wallace v. Methodist Hosp. Sys.*,
271 F.3d 212 (5th Cir. 2001) .......... 26

*Wilkerson v. Parish*,
No. 21-30716, 2025 U.S. App. LEXIS 11962
(5th Cir. May 16, 2025) .......... 25, 26, 27, 28, 33

*York v. Ezell*,
No., 24-50770, 2025 U.S. App. LEXIS 13686
(5th Cir. June 4, 2025) .......... 41

**Constitutional Provisions & Statutes**

42 U.S.C. § 2000e-2(a)(1) .......... 23

42 U.S.C. § 2000e-3(a) .......... 43

Tex. Labor Code § 21.051 .......... 23

Tex. Labor Code § 21.055 .......... 43

**Rules & Regulations**

29 C.F.R. § 1601.3 .......... 48

29 C.F.R. § 1601.9 .......... 48

Fed. R. App. P. 32 .......... 52

Fed. R. Civ. P. 56 .......... 21, 34

Fed. R. Evid. 603 .......... 34

Fed. R. Evid. 801 .......... 34

Fed. R. Evid. 802 .......... 34

Fed. R. Evid. 901 .......... 34

## STATEMENT OF THE ISSUES

1. Did the district court correctly grant summary judgment in Oracle's favor on Eleazer's discrimination claims because:

    a. Eleazer failed to meet the fourth element of a prima facie case for discrimination because she provided no evidence that she was treated less favorably than a similarly-situated comparator? (Eleazer's issue 1)

    b. Eleazer provided no evidence that Oracle's legitimate, nondiscriminatory reasons for terminating Eleazer's employment were pretextual? (unaddressed by Eleazer)

2. Did the district court correctly grant summary judgment in Oracle's favor because:

    a. Eleazer provided no evidence that Oracle's legitimate, nonretaliatory reasons for terminating Eleazer's employment were pretextual? (unaddressed by Eleazer)

    b. Eleazer failed to exhaust administrative remedies for her retaliation claim because she did not mention retaliation or describe any protected activity in her EEOC charge? (Eleazer's issue 2)

**BRIEF OF APPELLEE ORACLE AMERICA, INC.**

Plaintiff–Appellant Jameka Eleazer worked as a salesperson for Defendant–Appellee Oracle America, Inc. Eleazer's sales numbers were unsatisfactory. She was consistently at or near the bottom of her team in terms of closed sales (attainment), at the very bottom of her team in terms of likely sales (pipeline), and not performing enough activities designed to generate sales and build a healthy pipeline. Her management also repeatedly observed a lack of urgency and proactivity.

Oracle's management met with Eleazer on a weekly basis in an attempt to help Eleazer improve her performance. When that effort was unsuccessful, Oracle placed Eleazer on a Performance Improvement Plan. And when that did not work, Oracle terminated Eleazer's performance.

Eleazer sued for discrimination and retaliation under both Title VII and Chapter 21 of the Texas Labor Code, and the district court properly granted summary judgment in Oracle's favor on all claims.

On appeal, Eleazer strenuously argues she was treated poorly and ultimately terminated because she is Black, and she repeatedly accuses Oracle of treating her worse than it treated anybody else. But her

arguments and accusations are not backed by evidence. And saying something—no matter how loudly or how often—does not make it true.

Critically, Eleazer can point to no other salesperson whose numbers were as low as hers. Nor can she point to another salesperson who was repeatedly counselled for a lack of urgency and proactivity. This lack of comparator evidence is fatal to her claims. She cannot establish even a prima facie case of discrimination.

Nor can she establish that Oracle's legitimate, nondiscriminatory, and nonretaliatory explanation for her termination—poor performance—is a pretext for discrimination or retaliation. Again, she has no evidence.

In addition, Eleazer failed to exhaust her administrative remedies for her retaliation claims, as her EEOC charge does not indicate in any way that she was pursuing such claims. A primary purpose of an EEOC charge is to put an employer on notice of an employee's claims, both to be fair to the employer and to encourage conciliation. It is undisputed that Eleazer's charge did not serve this function.

This Court should reject Eleazer's arguments and affirm the judgment of the district court in its entirety.

# I. Statement of the Case[1]

## A. Eleazer's employment is terminated for low performance.

Eleazer, who is Black, began her employment with Oracle as a Business Development Consultant (BDC) in February 2019. ROA.107, 130. The BDC role is an entry-level sales position at Oracle that does not have responsibility for booking or closing any actual sales. ROA.107, 166. Instead, a BDC uncovers lead or opportunities and passes them along to the sales team. ROA.107.

After serving in this entry-level position for approximately a year and a half, Eleazer was promoted to an Application Sales Representative (ASR) in July 2020. ROA.130. As an ASR, her responsibilities shifted to working with existing Oracle clients to sell them expansions to the existing products that they have already purchased, as well as selling them new Oracle products. ROA.107, 130, 166.

Unlike BDCs, ASRs are expected to meet certain quarterly goals for actual sales revenue from closed sales (attainment). ROA.107, 109–110.

---

[1] Oracle's brief sets forth the facts Oracle believes are relevant to the issues before the Court and also rebuts certain assertions from Eleazer's brief. Oracle does not address factual (or legal) assertions Eleazer put forth below but does not raise in her brief on appeal, as it appears Eleazer is no longer relying on those assertions.

ASRs are also expected to meet expectations for their sales that may close in the future (pipelines). ROA.107–110. Additionally, ASRs are expected to meet certain expectations for sales generation activities (Key Performance Indicators, or KPI), showing their engagement in activities to assist in generating sales and building the sales pipeline, including making telephone calls, sending emails, scheduling and participating in meetings, and presenting product demonstrations. ROA.107.

**1. Eleazer's performance review for the 2022 Fiscal Year was "Needs Improvement."**

In her role as an ASR, Eleazer initially reported to Mike Miezo. ROA.130, 170. When Miezo left Oracle, Nicole Levitt, who was Eleazer's Area Sales Manager, assumed direct supervisory responsibility over Eleazer for the remainder of Oracle's 2022 Fiscal Year (FY), which runs from June 1 through May 31. ROA.130, 170. As a result, Levitt issued Eleazer her annual performance evaluation for Fiscal Year 2022. ROA.130, 134–39.[2]

[2] Eleazer's assertion that Levitt had "very little information about her work performance," Eleazer Brief at 2, is unsupported by the record; Levitt had both direct and second-line managerial visibility into Eleazer's work. ROA.130.

In Eleazer's 2022 performance evaluation, Levitt issued her an overall rating of "Needs Improvement," as well as ratings of "Needs Improvement" for both Performance Goals and Competencies. ROA.130, 134–36. Levitt commented that Eleazer had met only 62% of her annual sales quota. ROA.134. And she mentioned several times the need for Eleazer to be more proactive:

- "While Jameka did have a deal close each quarter in FY22, the opportunity for her in the new FY will be around a more proactive approach to engagement and developing a compelling event that may not already exist, to allow for more mid-contract deals for new modular add-ons." ROA.134.
- "If Jameka is able to take ownership and initiative within her accounts, be proactive with customers, and ask for help when needed, I believe she has the potential to see growth in herself and her abilities within this role." ROA.134–35.
- "Jameka understands that lack of urgency and reactiveness rather than proactiveness resulted in deals being left on the table in FY22. For FY23, Jameka has a large opportunity to be proactive and stay on top of her own business, which if executed upon, will result in increased success and deals closed QoQ, which is a goal of hers." ROA.136.

The evaluation also referred to "gaps" in Eleazer's fundamental competencies. ROA.136.

### 2. Eleazer gets a new manager who also notices performance deficiencies.

In June 2022, at the beginning of Fiscal Year 2023, Garrett Miller became Eleazer's direct manager, with Levitt resuming her role as Eleazer's second-level manager. ROA.107, 130, 167–68. Miller noticed the same lack of urgency Levitt described in the performance evaluation, as Eleazer regularly missed various deadlines and failed to complete tasks in a timely manner. ROA.107, 136. Miller contemporaneously documented Eleazer's performance deficiencies in a Performance Management Log, which he maintained as a matter of course for all employees on his sales team. ROA.107, 114–26, 273–74.[3] Although Eleazer alleges Miller "treated her worse than every other employee on the team from the beginning" and lodges a number of complaints about

[3] Miller kept a spreadsheet that contains a log for each team member in a separate tab. ROA.107, 279. He no longer has the logs from Fiscal Year 2023 because he received a new work laptop in August 2023, and during the process of moving relevant files from his old laptop to the new one, he cleaned up and deleted several files and folders, including the spreadsheet with the performance logs for his team in Fiscal Year 2023. ROA.279. Miller did not see a need to keep the logs because his division had undergone a significant reorganization in June 2023, right after Fiscal Year 2023 ended, and he only retained two of his ASRs. ROA.279. Eleazer's performance log remained available because Miller had shared it with Human Resources during the Performance Improvement Plan process. ROA.279.

his management style, *see* Eleazer Brief at 2, the only evidence she cites that he treated her differently at all is her testimony that he asked her but not others about their work flight details. ROA.220.

Like Levitt, Miller also observed that Eleazer lacked the ability to drive her own sales without relying on significant assistance from either himself or Eleazer's assigned field team. ROA.107. Her sales attainment was good in Quarter 1 (Q1) of Fiscal Year 2023, at 154% of her goal, but this number was a result of a sale that was set up before Eleazer took over the territory and which was largely driven by her field sales team, not Eleazer, ROA.108, 128—a fact Eleazer has never disputed. In other words, Eleazer received credit for this sale even though she had very little involvement in it. ROA.108, 128. In subsequent quarters, her inability to drive her own sales led to her achieving only 12% of her sales attainment goal in Quarter 2 (Q2) and 49% of her sales attainment goal in Quarter 3 (Q3). ROA.107. In addition to Eleazer's low sales attainment numbers, her pipeline generation metrics and KPIs were also well below Oracle's stated expectations. ROA.108.

Because this was Miller's first time to serve in a management-level role, in the fall of 2022 he began to consult with Levitt, his Area Sales

Manager, and Denise Choi, the designated Human Resources Business Partner for his Sales Area, to seek their advice as to how best to address Eleazer' performance issues. ROA.108, 130, 153. Based on these consultations and discussions, Miller initiated weekly "performance sync" meetings with Eleazer in an attempt to help her improve her performance. ROA.108, 130, 153. When Eleazer failed to show significant improvement, Miller met again with Levitt and Choi. ROA.108, 130–31, 153. The three of them all agreed that a Performance Improvement Plan (PIP) was the appropriate next step. ROA.108, 130–31, 153.

**3. Eleazer is placed on a PIP.**

Miller placed Eleazer on a PIP on March 29, 2023. ROA.108.[4] Miller met with Eleazer that same day to discuss four categories of performance deficiencies, all identified in the PIP: (1) Eleazer's failure to meet Oracle's sales attainment goals; (2) her failure to meet Oracle's pipeline expectations; (3) her failure to engage in expected sales generation activities (KPIs), including telephone calls, emails, meetings and sales

[4] This was the first PIP Miller had ever seen because he had never been issued one himself, and Fiscal Year 2023 was his first time ever to serve in a management-level role. ROA.108, 207.

demonstrations; and (4) her lack of urgency in completing day-to-day tasks and assigned action items. ROA.108, 128, 169.

Miller addressed each category in turn. As for attainment, Miller highlighted that Eleazer had only met her sales attainment goals during one quarter of the Fiscal Year (Q1, in which she received credit for a sale for which she was not primarily responsible); she had only reached 12% and 49% of her attainment goals in Q2 and Q3, respectively; and she had achieved only 62% in Fiscal Year 2022. ROA.108, 128, 169. Eleazer testified she agrees with these numbers. ROA.169.[5] Miller also discussed Eleazer's failure to meet her pipeline generation goals—indeed, her pipeline numbers were even worse than her attainment numbers (Q1: 28%, Q2: 20%, Q3: 22%). He discussed her failure to meet the KPI goals for pipeline generation activities, as she was completing significantly fewer calls, emails, meetings, and demos than expected. ROA.108, 128.

---

[5] There is no evidence, contrary to Eleazer's claims, that Eleazer's management ever said her numbers and goals were unattainable or unrealistic. *See* Eleazer Brief at 1, 3. Instead, the only evidence shows that management had the same expectations for Eleazer as they had for everyone on the team, and they believed those expectations were "doable in [her] territory." ROA.110, 128, 143. It was Eleazer who complained that the pipeline expectation was "not a realist metric for [her] territory." ROA.143. Miller, Levitt, and Choi all determined that the PIP was correctly issued. ROA.108, 130–31, 153.

Finally, he noted that there were several occasions in which Eleazer had failed to complete various action items by the designated deadlines. ROA.108, 128. Miller noted that they had discussed these performance concerns previously, but Eleazer had failed to make any significant improvement. ROA.108, 128. Accordingly, the PIP warned Eleazer that it was "critical" that she take responsibility for these issues and "make immediate and sustained improvement" to her overall performance because failure to do so would lead to further corrective action up to and including termination of her employment. ROA.128.

On April 3, a few days after receiving the PIP, Eleazer contacted Choi and complained that she felt the PIP was unfair and based on "inaccurate" data. ROA.153, 157. Choi met with Eleazer to discuss these concerns on April 5, and they had a follow-up meeting with Levitt the next week. ROA.131, 153, 171. During this meeting, Eleazer presented a written "rebuttal" to the PIP. ROA.153. However, after reviewing Eleazer's concerns with both Levitt and Miller, Choi determined that Eleazer had not identified anything improper with either the PIP or how Miller had tried to address Eleazer's performance issues. ROA.153. Instead, Choi found that Miller's actions were consistent with Oracle's

processes and expectations for handling such performance issues. ROA.153. Over the course of the next several weeks, Levitt, Choi and Miller exchanged emails with Eleazer and had various discussions with her in an attempt to address her concerns regarding the PIP, as well as to discuss her progress against the PIP. ROA.108, 131, 153–54.

**4. Eleazer's performance does not significantly improve.**

On May 2, 2023, about a month after Eleazer was placed on a PIP, Levitt, Choi and Miller all met again with Eleazer to discuss the PIP and her progress to date. ROA.131, 142–44, 172. Levitt summarized the discussion in an email to Eleazer on May 4. ROA.142–44.[6] The email began by emphasizing to Eleazer that although management had seen her make some additional efforts toward the performance deficiencies in the PIP, "even with these efforts, there is still a significant gap between where you are currently and what is expected from an ASR in this role and level of tenure." ROA.142. It then went on to address all four categories addressed in the PIP:

- "Pipeline Build and Attainment in Current Territory"
    - "It's not only about seeing what opportunities are right in front of you, but being able to get strategic in your

[6] Eleazer's response is in green font. ROA.141.

accounts to see what you can do to expand the territory and manufacture deals. It's about your ability to proactively find, progress and close all different types of deal cycles with our customers . . . ." ROA.142.

  - "While you've had closed deals in FY23, these deals have started with a customer coming to us providing a need and compelling event. In addition to these types of deal structures, we expect an ASR of your tenure to also be manufacturing and owning your own deals." ROA.143.

- "$650k is a consistent expectation for pipeline build across the board for reps in your role with similar territory structures and is doable in your territory." ROA.143.

- "Lack of Activities"

  - "While interactions are an important part of the job, they are only one small portion here. . . . Interaction metrics aside, you are still not meeting pipe/closed deals attainment and the expectations of the role." ROA.143–44.

- "Lack of Urgency and Initiative"

  - "Outside of the occasional fire drills, [Miller] and I have had to follow-up with you on deadlines that were missed." ROA.144.

  - "This is not a role where you are just checking the boxes and completing tasks when asked. It's not only about doing the more regular daily/weekly work you need to do, but taking it a step further and doing things to build and grow opportunities, by thinking about how you will take sales plays to the next level." ROA.144.

Levitt invited Eleazer to reach out if she wished to discuss anything further, or if her email did not address something Eleazer had already

raised. ROA.144. "Otherwise," she wrote, Miller "will continue to meet with you regularly to discuss your progress against the Performance Improvement Plan." ROA.144.

### 5. Eleazer's performance is not "average;" she ranks at the bottom of her team.

As the end of Oracle's Fiscal Year 2023 approached, Eleazer continued to rank last on her team for overall sales attainment, and her pipeline generation numbers were far below those of her colleagues, never exceeding 28% of her goals. ROA.108.

Admittedly, some of Eleazer's team members, who are referred to herein by their initials, were not high performers. But none had numbers as poor as Eleazer's:

- **AH**
  - Attainment:
    - Q1 (93%); Q2 (8%); Q3 (452%); Q4 (3%)
    - FY 2023: 133%
  - Pipeline Generation:
    - Q1 (143%); Q2 (28%); Q3 (25%); Q4 (50%)
    - FY 2023: 62%[7]

- **AS**
  - Attainment:
    - Q1 (0%); Q2 (124%); Q3 (49%); Q4 (183%)
    - FY 2023: 110%

[7] The FY23 pipeline percentages are derived from adding each quarter and dividing by four.

- <u>Pipeline Generation</u>:
  - Q1 (134%); Q2 (178%); Q3 (40%); Q4 (40%)
  - FY 2023: 98%

- **AW**
  - <u>Attainment</u>:
    - Q1 (336%); Q2 (0%); Q3(0%); Q4 (48%)
    - FY 2023: 66%
  - <u>Pipeline Generation</u>:
    - Q1 (85%); Q2 (73%); Q3 (67%); Q4 (20%)
    - FY 2023: 61%

- **JW**
  - <u>Attainment</u>:
    - Q1 (0%); Q2 (68%); Q3 (26%); Q4 (112%)
    - FY 2023: 64%
  - <u>Pipeline Generation</u>:
    - Q1 (242%); Q2 (48%); Q3 (130%); Q4 (61%)
    - FY 2023: 120%

- **JL**
  - <u>Attainment</u>:
    - Q1 (0%); Q2 (161%); Q3 (0%); Q4 (18%)
    - FY 2023: 41%
  - <u>Pipeline Generation</u>:
    - Q1 (88%); Q2 (59%); Q3 (42%); Q4 (60%)
    - FY 2023: 62%

- **Eleazer**
  - <u>Attainment</u>:
    - Q1 (154%); Q2 (12%); Q3(49%); Q4 (0%)
    - FY 2023: 37%
  - <u>Pipeline Generation</u>:
    - Q1 (22%); Q2 (20%); Q3 (28%); Q4 (26%)
    - FY 2023: 24%

ROA.109–10, 241–44. Eleazer ranked last on her team for Fiscal Year 2023 for *both* sales attainment and pipeline generation—two key metrics

upon which Oracle measures an ASR's performance. *See* ROA.109–10, 128. And her pipeline generation numbers were 37 points lower than that of her nearest teammate. ROA.109–10.

Eleazer faults Oracle for not including in her attainment numbers a sale that closed the same day as her termination. Eleazer Brief at 4. But Miller and Levitt both testified the sale would not have made a meaningful impact on Eleazer's numbers. ROA.269, 275–76. Even with that sale, Eleazer's attainment numbers still would have been 50%, the second lowest on her team, despite the inclusion of the significant sale in Q1 for which she bore little responsibility.[8] ROA.108, 241–44. And the sale would not have changed her pipeline numbers at all; they still would have been the lowest on the team by far.

In addition to the poor sales attainment and pipeline numbers, Eleazer continued to rely on internal team members (managers, field representatives, and renewal teams) to progress and close sales on her accounts, despite repeated coaching on these issues. ROA.108. And Miller

[8] The 50% is calculated by adding the quarterly budgets, separately adding the quarterly actuals, and dividing the actual sum by the budget sum. Eleazer had a total FY23 attainment budget of $477,273 and total actual sales of $236,958, resulting in an attainment percentage of just under 50%. ROA.221–24.

continued to observe that Eleazer was merely "checking boxes" and doing "busy work," more akin to the entry level position of BDC that she previously held, instead of focusing on activities that could result in sales revenue or pipeline creation. ROA.108–09.[9]

**6. Eleazer's employment is terminated for unsatisfactory performance.**

As a result of these failures to show sufficient improvement in her performance, the determination was made by Miller and Levitt, in consultation with Choi, to move forward with terminating Eleazer's employment. ROA.108–09, 131, 154. Accordingly, Oracle terminated Eleazer's employment effective June 1, 2023. ROA.109, 131.

**B. Eleazer files a charge with the EEOC complaining of race discrimination.**

Eleazer filed a Charge of Discrimination jointly with the EEOC and Texas Workforce Commission Civil Rights Division on September 17, 2023. ROA.176–77.

[9] Miller did not testify that Eleazer's ranking in the pipeline metric was unimportant to him. *See* Eleazer Brief at 3 n.1. Rather, he testified he did not remember where she ranked and answered "No" to the question, "Was it important to you to find one or more metrics where she ranked lowest?" ROA.211.

The only claim in the EEOC charge is that Eleazer "believes she was discriminated against based on [her] race (black) in violation of the (sic) Title VII of the Civil Rights Act of 1964, as amended." ROA.177. The charge never mentions "retaliation," and it does not describe any protected activity. ROA.176–77. Instead, it focuses on Eleazer's termination, "unprofessionalism" by Miller, and being "informally put on performance plans for being unable to meet the Regional Managers expectations." ROA.176–77. While the charge states that Levitt and Choi were "aware of the treatment I was experiencing with the Regional Manager," nowhere in the EEOC charge does Eleazer allege that she made a report of discrimination or that she engaged in any other protected activity. ROA.176–77.

### C. The district court grants summary judgment in Oracle's favor.

Eleazer filed suit in the 455th District Court, Travis County, Texas, on June 12, 2024, alleging race discrimination and retaliation under both Chapter 21 of the Texas Labor Code and Title VII of the Civil Rights Act of 1964. ROA.12, 15–16. On July 11, 2024, Oracle timely removed the case to federal court, the Western District of Texas, Austin Division, on the basis of federal question jurisdiction. ROA.4–6.

After the parties completed discovery, Oracle filed a motion for summary judgment that sought judgment in its favor on the discrimination and retaliation claims. ROA.84–103. As for the discrimination claims, Oracle argued both that Eleazer could not establish the fourth element of a prima facie case—because there is no evidence that Eleazer was treated less favorably than similarly situated employees of another race—and that Eleazer could not satisfy her ultimate burden—because Oracle had a legitimate, nondiscriminatory reason for terminating Eleazer's employment, and there is no evidence of pretext. ROA.93–97, 97–101. As for the retaliation claims, Oracle similarly argued that Eleazer could not satisfy her ultimate burden because Oracle had a legitimate, nonretaliatory reason for terminating Eleazer's employment, and there is no evidence of pretext. ROA.97–101. Oracle also argued Eleazer failed to exhaust her administrative remedies for her retaliation claims. ROA.101–02. Eleazer filed a response in opposition, and Oracle filed a reply in support. ROA.178–87, 255–64.

The district court agreed with Oracle. On the discrimination claim, the court wrote that Eleazer had "not presented competent summary judgment evidence of a team member of hers that exhibited 'nearly

identical conduct to her own'" or that they had "essentially comparable violation histories." ROA.297–98 (quoting *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009)). Because the court concluded that Eleazer had not met the fourth element of a prima facie case for discrimination, entitling Oracle to summary judgment on that claim, it did not reach Oracle's arguments as to a legitimate non-discriminatory reason for the termination and no evidence of pretext. ROA.298. As for the retaliation claim, the court wrote that "Eleazer's failure to include an allegation of retaliation in her EEOC charge renders her retaliation claims unexhausted and outside the jurisdiction of this court." ROA.301. The court granted Oracle's motion, ordered Eleazer's claims to be dismissed, and signed a final judgment that same day. ROA.301.

## II. Summary of Argument

Summary judgment was proper on Eleazer's discrimination claims for two reasons. First, Eleazer failed to establish a prima facie case because she presented no evidence a non-Black teammate was treated more favorably under nearly identical circumstances. Indeed, Eleazer can point to no other ASR whose attainment, pipeline, and sales activity numbers were as low as hers or who was repeatedly counseled for a lack

of urgency and proactivity—much less another ASR whose performance suffered from all four flaws. Eleazer did not challenge the pipeline, sales activity numbers, or lack of urgency below, and her attempt to challenge the pipeline numbers for the first time on appeal must be rejected. While Eleazer complains that her sales attainment numbers would have been markedly different had she been given credit for a sale that closed after her termination, that complaint ignores the fact that her attainment numbers still would have been poor, as well as the totality of unsatisfactory performance with which her managers were faced. There is no evidence her managers ever called her lazy or otherwise mistreated her in other ways, much less that any similarly situated employee was treated more favorably. Second, Oracle articulated a legitimate, nondiscriminatory reason for Eleazer's termination—unsatisfactory performance—and Eleazer provided no evidence that this explanation was unworthy of belief or that Oracle's actual motivation was discriminatory animus. Although the district court did not reach this issue given its conclusion that Eleazer failed to establish a prima facie case, this Court can affirm for any reason apparent from the record, and the lack of pretext provides an additional ground for affirmance.

Summary judgment was also proper on Eleazer's retaliation claims for two reasons. First, Oracle once more articulated a legitimate, nonretaliatory reason for Eleazer's termination—unsatisfactory performance—and Eleazer once more failed to provide any evidence this reason was pretextual. Again, this Court can affirm for any reason apparent from the record. Second, Eleazer failed to include retaliation in her EEOC charge and thus failed to exhaust her administrative remedies with respect to those claims. Mentioning retaliation in an unsigned, unverified intake questionnaire is insufficient under this Court's precedent.

The district court's final judgment should be affirmed in its entirety.

## III. Argument

### A. Standard of review.

A grant of summary judgment is reviewed de novo, applying the same standards as the district court. *Awe v. Harris Health Sys.*, 163 F.4th 969, 972 (5th Cir. 2026). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

"'Where the non-movant bears the burden of proof at trial, the movant may merely point to an absence of evidence,' which 'shifts to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial.'" *Stelly v. Dep't of Pub. Safety & Corr. La. State*, 149 F.4th 516, 521 (5th Cir. 2025) (quoting *Lindsey v. Sears Roebuck & Co.*, 16 F.3d 616, 618 (5th Cir. 1994)).

"Although all justifiable inference must be drawn in favor of the non-movant, the non-movant still cannot defeat summary judgment with speculation, improbable inferences, or unsubstantiated assertions." *Likens v. Hartford Life & Accident Ins. Co.*, 688 F.3d 197, 202 (5th Cir. 2012) (internal citation omitted); *see also Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 427 (5th Cir. 2000) (plaintiff's subjective belief that he was discriminated against because of his race is insufficient to create fact issue). Rather, the non-movant "must set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998).

This Court can "affirm for any reason supported by the record, even if not relied on by the district court." *Clarkston v. White*, 943 F.3d 988, 992 (5th Cir. 2019); *Kolpakchi v. Principi*, 113 F. App'x 633, 636 (5th Cir. 2004) (affirming on grounds that plaintiff failed to establish a prima facie case where district court had assumed all elements were satisfied and thus decided the case on other grounds).

### B. The district court correctly granted summary judgment on Eleazer's discrimination claim. *(Oracle issue 1, Eleazer issue 1)*

Title VII and Chapter 21 of the Texas Labor Code both prohibit an employer from discharging or otherwise discriminating against an employee in the terms and conditions of her employment because of her race. 42 U.S.C. § 2000e-2(a)(1); TEX. LABOR CODE § 21.051. The law governing the two claims is "identical." *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 403 n.2 (5th Cir. 1999).

When, as here, a plaintiff relies on circumstantial evidence to establish discrimination, the familiar *McDonnell Douglas* burden-shifting standard applies. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 142 (2000); *Saketkoo v. Adm'rs of Tulane Educ. Fund*, 31 F.4th 990, 997 (5th Cir. 2022) (both citing *McDonnell Douglas Corp. v.* Green,

411 U.S. 792 (1973)).[10] Under that standard, Eleazer first has to establish a prima facie case. *Reeves*, 530 U.S. at 142; *Saketkoo*, 31 F.4th at 997. If and only if she does so, the burden shifts to Oracle to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Reeves*, 530 U.S. at 142; *Saketkoo*, 31 F.4th at 999. If Oracle meets this burden, Eleazer must then prove "that the legitimate reasons offered by" Oracle "were not its true reasons, but were a pretext for discrimination." *Reeves*, 530 U.S. at 142 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)); *see also Saketkoo*, 31 F.4th at 999. The ultimate burden of proving that Oracle intentionally discriminated against her "remains at all times with" Eleazer. *Burdine*, 450 U.S. at 253; *Saketkoo*, 31 F.4th at 999.

---

[10] The district court articulated a modified *McDonnell Douglas* approach that applies in mixed-motive cases. ROA.295. The mixed-motive framework only applies, however, in a case in which the plaintiff "relies on a 'mixed-motive' theory—i.e., alleges that even if the employer's 'proffered reasons are not pretextual, racial animus was also a *motivating factor* for her firing.'" *Bassett v. Gray Media Grp., Inc.*, No. 25-60278, 2026 U.S. App. LEXIS 14803, at *6 (5th Cir. May 22, 2026) (quoting *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 347 (5th Cir. 2007)) (emphasis added in *Bassett*). Here, Eleazer does not rely on a mixed-motive theory, so the standard *McDonnell Douglas* approach, set forth above, applies. *See id.*

1. **There is no evidence to support the fourth element of Eleazer's prima facie case, i.e., that Eleazer was treated less favorably than other similarly situated employees outside her protected group. (*Oracle issue 1.a, Eleazer issue 1*)**

For her prima facie case, Eleazer must establish four elements. Specifically, she must show she:

> (1) is a member of a protected class; (2) was qualified for the position at issue; (3) was the subject of an adverse employment action, and (4) was replaced by someone outside [her] protected group or was treated less favorably than other similarly situated employees outside the protected group.

*Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009); *Wilkerson v. Parish*, No. 21-30716, 2025 U.S. App. LEXIS 11962 at *7–8 (5th Cir. May 16, 2025) (quoting *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007) (per curiam)).

Even assuming Eleazer could establish the first three elements, there is no evidence of the fourth. It is undisputed that she was not replaced by someone outside of her protected group (Black). Thus, the question becomes whether there is any evidence that Eleazer was treated less favorably than other similarly situated employees outside her protected group. The answer is "no."

The similarly-situated prong of the prima facie case requires Eleazer to identify at least one co-worker, outside of her protected group, who was treated more favorably "under nearly identical circumstances." *Wilkerson*, 2025 U.S. App. LEXIS 11962 at *8 (quoting *Lee*, 574 F.3d at 259). "This co-worker, also referred to as a comparator, must" (1) hold the same job or same job responsibilities as Eleazer; (2) share the same supervisor or decisionmaker; and (3) have a history of violations or infringements similar to Eleazer's. *Id.* (quoting *Alkhawaldeh v. Dow Chem. Co.* 851 F.3d 422, 426 (5th Cir. 2017); internal quotation marks omitted). In addition, and "critically," the "plaintiff's conduct that drew the adverse employment decision must have been nearly identical to that of the proffered comparator who allegedly drew dissimilar employment decisions." *Lee*, 574 F.3d at 260. "If the 'difference between the plaintiff's conduct and that of those alleged to be similarly situated *accounts for* the difference in treatment received from the employer,' the employees are not similarly situated for the purposes of an employment discrimination analysis." *Id.* (quoting *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 221 (5th Cir. 2001)). Eleazer has failed to identify a sufficiently comparable comparator and thus has failed to establish a prima facie case.

#### a. Eleazer was terminated for a combination of reasons, three of which Eleazer did not address below.

Oracle terminated Eleazer's employment because she did not show significant improvement in the four areas identified in her PIP:[11] (1) lack of overall attainment, (2) unsatisfactory pipeline, (3) lack of KPI, or sales generating, activities, and (4) lack of urgency and proactivity. ROA.108–09, 128, 142–44; *see* above at Part I.A. To survive summary judgment, Eleazer needed to point to a team member who was similarly situated in "all" four respects. *See Wilkerson*, 2025 U.S. App. LEXIS 11962, *9–10 ("It is fundamental that . . . the plaintiff . . . show that the comparables are similarly situated *in all respects*.") (emphasis in original, internal quotation marks omitted); *Lee*, 574 F.3d at 260 (stating conduct that drew adverse employment decision must have been "nearly identical" to proposed comparator); *Runnels v. Tex. Children's Hosp. Select Plan*, 167 F. App'x 377, 385 (5th Cir. 2006) (holding that when three factors played into compensation decision but plaintiffs failed to show they were

[11] To the extent being placed on a PIP is ever actionable under Title VII and the Texas Labor Code, any claim that the PIP was discriminatory fails for the exact same reasons as Eleazer's claim that her termination was discriminatory. *See* Parts III.B.1.a–d.

"similarly situated as to all the factors," they had "failed to show 'nearly identical' circumstances").

Although Eleazer challenged the sales-attainment numbers below, she did not even address her pipeline percentages, lack of KPI activities, or lack of urgency—and she does not address the KPI activities or lack of urgency on appeal, either.[12] Without addressing these factors, Eleazer cannot point to a team member who performed nearly identically in all material respects giving rise to the PIP and termination. *See Wilkerson*, 2025 U.S. App. LEXIS 11962, *9–10; *Runnels*, 167 F. App'x at 385. For this reason alone, summary judgment must be affirmed on her discrimination claim. *See id.*

---

[12] With respect to her KPI activities, Eleazer at best complains that the number of calls listed in her PIP is incorrect because Miller used a tool that was inaccurate to count the calls. *See* Eleazer Brief at 3 (citing ROA.217–19). But Eleazer testified she was not sure which tool Miller used to pull the call numbers. ROA.218. And the record contains no evidence as to what the "correct" number would be. Moreover, Eleazer did not challenge any of the other KPI activity counts. *See* ROA.128 (PIP highlighting shortcomings in calls, emails, meetings, & demonstrations); *see also* ROA.108.

**b. Eleazer has forfeited the opportunity to challenge the pipeline numbers, as she did not even mention them below.**

As just mentioned, Eleazer did not address her pipeline numbers at all in the district court. *See* ROA.178–87; *see also* ROA.257 (Oracle's pointing this failure out to district court); ROA.297 (district court's acknowledging same). On appeal, however, Eleazer argues that Miller adjusted her pipeline numbers downward—and that the "pipeline numbers themselves are themselves evidence of discrimination." Eleazer Brief at 8–9. By failing to make this—or any other—argument regarding the pipeline below, Eleazer has forfeited it, and this Court should not consider it further. *Cambric v. City of Corpus Christi*, 170 F.4th 321, 325 (5th Cir. 2026); *Tex. Commer. Energy v. TXU Energy, Inc.*, 413 F.3d 503, 510 (5th Cir. 2005).

Even if Eleazer had not forfeited this argument, it would not create a genuine issue of material fact that could save her discrimination claim. Assuming for the sake of argument that Miller did adjust Eleazer's pipeline numbers, there is no evidence he did not also do the same for Eleazer's teammates—and such proof would be necessary to show the adjustments were unique to Eleazer and therefore potentially

discriminatory. After all, if Miller adjusted non-Black employees' pipeline numbers, too, no reasonable jury could conclude that the adjustments were because Eleazer is Black. And it is rank speculation to assume that any adjustment to anybody's pipeline numbers—assuming there were, in fact, such adjustments—had a nefarious purpose, as opposed to reflecting Miller's business judgment about the true value of the pipeline.[13] *See LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 391 (5th Cir. 2007) (explaining that employment discrimination cases are not a vehicle to second-guess an employer's business decisions).

Eleazer also suggests that because her attainment numbers were "in the middle of the pack" or "typical for the team," her low pipeline numbers must be inaccurate. Again, this argument was not raised below and should not be considered here. *See Cambric*, 170 F.4th at 325. But even if her attainment numbers were average—and they were not—there is not necessarily a direct correlation between pipeline and attainment, as Eleazer's teammates' numbers demonstrate. *See* Part I.A.5; ROA.109–

---

[13] Because of Eleazer's failure to raise this allegation below, Oracle has been deprived of an opportunity to explain why an adjustment to the pipeline numbers (assuming the truth of Eleazer's current allegation) would have been appropriate.

10. High attainment quarters are sometimes preceded by low pipeline quarters, and low attainment quarters are sometimes preceded by high pipeline quarters. *See* ROA.109–10. Tellingly, ASRs with similar pipeline numbers had varying attainment numbers: for Fiscal Year 2023, AH had a pipeline of 62% pipeline but 133% attainment, while AW had a 61% pipeline but 66% attainment, and JL had a 62% pipeline but only 41% attainment. ROA.109–10; *see* Part I.A.5. Thus, no reasonable inference can be drawn from Eleazer's attainment numbers that her pipeline numbers were artificially and discriminatorily deflated. Even with this forfeited argument, Eleazer has failed to create a fact issue that would preclude summary judgment. *See Likens*, 688 F.3d at 202.

**c. Eleazer's sales attainment was not nearly identical to most of the members of her team, and it cannot be viewed in a vacuum.**

Without factual support, Eleazer alleges that her managers intentionally terminated her before a $60,000 sale to make her numbers look bad. Eleazer Brief at 8. With credit for that sale, Eleazer claims, she would have ranked fourth out of six among her team members for Q4. *Id.* This assertion ignores numerous important facts.

First, even counting the sale and accepting Eleazer's valuation of it at $60,000, Eleazer's attainment for FY 2023 would have been only 50%, the second lowest on her team. ROA.109–10, 241–44. Second, the adjusted FY 2023 percentage would still have included the significant sale in Q1 that was, undisputedly, set up before Eleazer took over the territory and largely driven by her field sales team—a fact Oracle was not required to ignore in assessing Eleazer's sales metrics. ROA.108. Third, the additional sale would not have changed Eleazer's pipeline numbers, her lack of KPI activities, or the lack of urgency and proactivity observed by both Levitt and Miller. ROA.107–10, 128, 134–39, 142–44. Thus, even with the sale, Eleazer still cannot point to a non-Black employee who was treated more favorably under nearly identical circumstances.

Levitt testified the sale "would not have had a meaningful impact on her overall attainment for the quarter." ROA.269. And Miller testified "it wouldn't have . . . changed the . . . termination being the correct next step . . . ." ROA.275–76. The sale simply would not have made enough of a difference. Summary judgment was appropriate.

**d. Eleazer relies on unsworn, unauthenticated, hearsay that still does not provide evidence of a similarly situated comparator.**

Eleazer accuses Miller of claiming that "Eleazer was allowing the field representatives to do all the work," "consistent with prevalent stereotypes about Black people being lazy." Eleazer Brief at 10, 11. But there is a difference between saying, on the one hand, that "field teams were taking the lead" on "most, if not all," or Eleazer's accounts, or that Eleazer's FY 2023 deals had "started with a customer coming to us" instead of through Eleazer's proactively manufacturing her own deals, and saying, on the other, that Eleazer allowed field representatives to do "all the work." *Compare* ROA.108–09, 142–43, 206; *with* Eleazer Brief at 10–11. The criticism related to proactivity, not laziness; there is no evidence anyone at Oracle ever referred to Eleazer as lazy, and no evidence of any stereotyping of any kind. Plaintiff's inflammatory and unsupported allegations to the contrary should be disregarded.

In addition to these unfounded accusations, Eleazer also asserts there is "no evidence in the record that Miller actively distorted the role of field representatives in the sales made by others on his team." *Id.* at 11. This is true, but the argument nevertheless fails for three reasons.

First, there is no competent evidence in the record that Miller distorted, or even misunderstood, the role of field representatives in the *sales made by Eleazer*.[14] The notes Eleazer relies on in support of this argument are undated, unsworn, and unauthenticated hearsay, ROA.247–48, and they cannot be presented in a form that would be admissible in evidence. *See* FED. R. EVID. 603, 801, 802, 901; FED. R. CIV. P. 56(c)(2), (c)(4). Notably, Eleazer never attempted to show that it would be "possible to put the information into an admissible form," and any such arguments she may attempt in her Reply are forfeited. *See Balboa Capital Corp. v. Okoji Home Visits MHT, L.L.C.*, 111 F.4th 536, 546–47 (5th Cir. 2024) (quoting *Campos v. Steves & Sons, Inc.*, 10 F.4th 515, 521–22 (5th Cir. 2021) (cleaned up)). Eleazer cannot rely on these notes.

---

[14] Eleazer inaccurately describes the record when she claims Miller "admitted that he couldn't remember a single time that he observed interactions between a field representative and [Eleazer]" and "admitted that he reviewed a note from the field representative assigned to [Eleazer] that contradicted that notion," i.e., that field teams were taking the lead on Eleazer's sales. Eleazer Brief at 10. At his deposition nearly two years after her termination, Miller had no specific memory of specific conversations with Eleazer and field reps. ROA.205. And he did not know what field representative Hank Bergstresser's impressions were. ROA.210. He remembers Eleazer's showing him a note from Bergstresser but did not testify to its contents. ROA.210–11.

Second, and more importantly, even with the notes, there is no evidence in the record—one way or the other—of the role of field representatives in sales made by Eleazer's teammates, or of Miller's view of that role. Even if they were considered, the notes would not provide evidence of a similarly situated comparator, so they are "irrelevant." *See* ROA.296–97 n.2 (declining on this basis to decide whether the notes could constitute admissible evidence at trial).

In fact, the only evidence in the record is that a non-Black employee whose attainment was low, except for a "field led deal," was also placed on a PIP and, when she failed to show significant improvement, terminated. ROA.131, 146, 154. Like Eleazer, this employee failed to meet her sales attainment quota for FY2023, failed to meet her new pipeline quotas, and failed to meet her expected pipeline generating activities (KPIs). ROA.131, 146, 154. Moreover, because this other ASR worked in the same designated Sales Area as Eleazer, Levitt was one of the primary decision-makers, in her capacity as Area Manager, and Choi

was also directly involved in her capacity as the Sales Area's designated Human Resources Business Partner. ROA.131.[15]

Regardless, it is Eleazer's burden to "show that other similarly situated employees outside her protected class were treated *more* favorably"—not Oracle's burden to show it treated them the same. *See* ROA.298 (citing *Standley v. Rogers*, 680 F. App'x 326, 327 (5th Cir. 2017)). Eleazer failed to meet this burden, both because she did not provide evidence that would allow a comparison to be made between herself and her team members regarding their field representatives' involvement in their sales, and because the failure to drive sales was only one factor leading to her PIP and termination.

[15] The comparison to this ASR is the reason for Eleazer's characterization of Oracle's summary judgment motion as claiming, "We couldn't have discriminated based on race because the only other person in this area, where most of the workers are white, that we've disciplined for poor performance is from a different racial minority group." Eleazer Brief at 5. But this characterization twists the argument and ignores the legal standard.

#### e. Eleazer's complaints of other alleged discriminatory treatment fail for the same reason: Eleazer has not identified an appropriate comparator.

To the extent Eleazer complains about treatment other than her termination, like Miller's alleged micromanagement, Eleazer Brief at 1–2, those complaints likewise fail for lack of appropriate comparator evidence.

Eleazer claims that Miller treated her "worse than every other employee from the beginning" and provides a laundry list of complaints. Eleazer Brief at 1, 2. Specifically, she claims he (1) "belittled her," (2) "demanded evidence for every little thing she told him," (3) "micromanaged her," (4) nitpicked and extensively documented her performance of menial data entry tasks," (5) "pried into her personal life," and (6) "refused to discuss career development or raises with her." Eleazer Brief at 2. The only evidence Eleazer cites in supposed support of these allegations are ten pages of her deposition testimony. *Id.* (citing ROA.220–30).[16]

[16] Eleazer also cited her own summary judgment response, which is not evidence, and testimony conveying the undisputed fact that she was the only Black employee on the team. *See* Eleazer Brief at 2 (citing ROA.180–84, 203–04).

These conclusory allegations do not survive summary judgment for a litany of reasons. *See* ROA.220–30; *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (Title VII is not a "general civility code"); *Hamilton v. Dall. Cty.*, 79 F.4th 494, 505 (5th Cir. 2023) (Title VII "does not permit liability for de minimis workplace trifles"); *Owens v. Circassia Pharm., Inc.*, 33 F.4th 814, 833, 836 (5th Cir. 2022) ("Conclusory declarations are insufficient to create issues of fact. . . . [E]mployment laws do not transform federal courts into human resources managers, so the inquiry is not whether [the employer] made a wise or even correct decision . . . ."). Most importantly, however, Eleazer lacks comparator evidence for these allegations, too. There is no evidence—as opposed to allegations in her briefing—that Miller treated Eleazer's coworkers more favorably than he treated her. *See* ROA.220–30. Indeed, the only disparate treatment Eleazer even discussed in her deposition was Miller's allegedly asking her for details about her work flights, something she says "the people [she] was close to on the team" told her he did not do to them. ROA.220. Putting aside the hearsay nature of this testimony, and assuming its truth and actionability, Eleazer still has not

established that the people she was close to were treated more favorably under nearly identical circumstances. *See* above at Parts III.B.1–d.

***

Because there is no evidence that Eleazer was treated less favorably than similarly situated employees outside of her protected class, she cannot establish a prima facie case of discrimination under either Title VII or Chapter 21, and Oracle is entitled to summary judgment.

**2. Eleazer provided no evidence that Oracle's legitimate, nondiscriminatory reasons for terminating Eleazer's employment were pretextual. (*Oracle issue 1.b, not addressed by Eleazer*)**

"Because the evidence provides that Eleazer has not established a prima facie case, the [district court did] not reach the parties' arguments as to the second and third steps of the *McDonnell Douglas* burden-shifting framework." ROA.298. Since this Court can affirm for any reason supported by the record, however, Oracle addresses those latter steps here. *See Clarkston*, 943 F.3d at 992. Even if Eleazer were able to establish all of the prima facie elements of a discrimination claim (which she cannot, for the reasons set forth above), Oracle would still be entitled to summary judgment because the undisputed evidence shows that

Eleazer was terminated for a legitimate nondiscriminatory reason—unsatisfactory performance—and Eleazer has no evidence that this explanation is pretextual. *See* above at Part III.B (setting forth burden shifting framework).

**a. Oracle met its burden of production and showed Eleazer was terminated for a legitimate, nondiscriminatory reason: her unsatisfactory performance.**

Oracle articulated the reason for Eleazer's termination—her unsatisfactory performance—and produced supporting evidence. *See* above at Parts I.A & III.B.1.a–e. Poor performance is a legitimate nondiscriminatory reason for termination. *See, e.g.*, *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 231–33 (5th Cir. 2015); *Feist v. La., Dep't of Just., Off. of the Atty. Gen.*, 730 F.3d 450, 455 (5th Cir. 2013) (both finding poor performance to be a legitimate, non-discriminatory reason for employment decisions). Thus, Oracle has satisfied its burden to articulate a legitimate non-discriminatory/non-retaliatory reason for its actions under the second prong of the *McDonnell-Douglas* test.

**b. Eleazer presented no evidence of pretext.**

Because Oracle has articulated a legitimate, nondiscriminatory basis for its actions, the burden shifts back to Eleazer to show that the

proffered reason for the employer's decision was a pretext for discrimination. "Pretext" is "giving a false reason for an action to obscure the real reason." *Owens*, 33 F.4th at 827 n.8. It is not enough to produce evidence sufficient to cast doubt on the believability of the employer's explanation. *Id.* at 826. Rather, the "evidence must permit a reasonable inference that [the employer's] false reason was pretext for the true, discriminatory, reason." *Id.* at 833; *see also York v. Ezell*, No. 24-50770, 2025 U.S. App. LEXIS 13686 at *7 (5th Cir. June 4, 2025) (quoting *Price v. Fed. Express Corp.*, 283 F.3d 715, 720 (5th Cir. 2002)) ("To show pretext on summary judgment, 'the plaintiff must substantiate his claim of pretext through evidence demonstrating that discrimination lay at the heart of the employer's decision.'").

Here, Eleazer has no evidence of falsity or of discriminatory intent. Below, she pointed to the following "evidence:" "(1) Ms. Eleazer's performance was typical of members of her sales team. (2) Miller manipulated her sales numbers by firing her before a large deal was set to close so that her performance would look worse than it really was. (3) Miller claimed that she had field representatives doing all her work, consistent with the stereotype of Black people as 'lazy,' . . . . (4)

Defendant's Austin sales team had a pattern of manufacturing performance allegations to fire employees in racial minority groups." ROA.186.

Aside from the last allegation, Oracle has already addressed these allegations, which are not borne out by the record. There is no evidence that Eleazer's performance was typical of her team; of any "manipulation;" or of anybody claiming that Eleazer had field representatives doing "all her work," calling her "lazy," or stereotyping her in any way. *See* above at Parts III.B.1–d. As for the fourth allegation, it is equally unsupported; there is absolutely no evidence that the other terminated employee's poor sales performance was "manufactured" or of any "pattern." Eleazer has not presented any evidence that would allow a reasonable jury to disbelieve Oracle's legitimate, nondiscriminatory reason for her termination, much less that would permit an inference of discrimination.

This Court's job as a reviewing court conducting a pretext analysis "is not to engage in second-guessing of an employer's business decisions," as "anti-discrimination laws do not require an employer to make proper decisions, only non-retaliatory ones." *LeMaire*, 480 F.3d at 391; *see also*

*Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir.1991) ("even an incorrect belief that an employee's performance is inadequate" is legitimate reason for termination). Although Eleazer clearly disagrees with the reasons for her termination, she has presented no evidence that the explanation is false or that her termination was motivated in any way by racial animus. Eleazer's argument and conjecture are insufficient to establish pretext, providing another ground for affirming the summary judgment in Oracle's favor.

### C. The district court correctly granted summary judgment on Eleazer's retaliation claim. (*Oracle issue 2, Eleazer's issue 2*)

#### 1. Eleazer provided no evidence that Oracle's legitimate, nonretaliatory reasons for terminating Eleazer's employment were pretextual. (*Oracle issue 2.a, not addressed by Eleazer*)

In addition to prohibiting discrimination, Title VII and the Texas Labor Code also prohibit retaliating against an employee for engaging in protected activity. 42 U.S.C. § 2000e-3(a); TEX. LABOR CODE § 21.055. The same burden-shifting framework applies. *Outley v. Luke & Assocs.*, 840 F.3d 212, 219 (5th Cir. 2016). If Eleazer establishes a prima facie case, then the burden shifts to Oracle to articulate and produce evidence of a legitimate, nonretaliatory reason for the termination. *Id.* The burden

then shifts back to Eleazer to show that Oracle's reasons are mere pretext for retaliation. *Id.* Ultimately, Eleazer must demonstrate that the termination would not have occurred "but for" Oracle's retaliatory motive. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).[17]

**a. Oracle met its burden of production and showed Eleazer was terminated for a legitimate, nonretaliatory reason.**

Assuming for the sake of argument that Eleazer could establish a prima facie case of retaliation, Oracle has articulated and produced evidence of a legitimate, nonretaliatory reason for Eleazer's termination. "Job performance is a legitimate, non-retaliatory reason for termination." *LeMaire*, 480 F.3d at 391. Oracle incorporates by reference all the evidence presented above about Eleazer's poor performance and will not repeat it here. The same analysis that applies to Eleazer's discrimination claim applies to her retaliation claim. Oracle has met its burden of articulating and showing that Eleazer was terminated for a legitimate, nonretaliatory reason.

[17] Below, Oracle did not challenge Eleazer's prima facie retaliation case, which is a very low bar. But it did assert a legitimate, nonretaliatory reason for her termination and that Eleazer has no evidence of pretext. ROA.97–101

**b. Eleazer presented no evidence of pretext.**

Likewise, the same pretext analysis that applies to Eleazer's discrimination claim also applies to her retaliation claim. Eleazer has no evidence that Oracle's legitimate, nonretaliatory reason for her termination is unworthy of credence or that the real reason was retaliation. Oracle is entitled to summary judgment on Eleazer's retaliation claims.

**2. Eleazer failed to exhaust her administrative remedies when she failed to include a retaliation claim in her EEOC charge. *(Oracle issue 2.b, Eleazer issue 2)***

Oracle is entitled to summary judgment on Eleazer's retaliation claims for an additional reason: she did not comply with the requirement that she "exhaust [her] administrative remedies before seeking judicial relief." *McClain v. Lufkin Industries, Inc.*, 519 F.3d 264, 273 (5th Cir. 2008) (Title VII); *Bunker v. Dow Chem. Co.*, 111 F.4th 683, 686 (5th Cir. 2024) (Chapter 21 of the Texas Labor Code). "Exhaustion occurs when an individual files a timely complaint with the Equal Employment Opportunity Commission (EEOC), her claim is dismissed by that agency, and the agency informs her of her right to sue in federal court." *Hall v.*

*Continental Airlines, Inc.*, 252 F. App'x 650, 653 (5th Cir. 2007) (citing *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 379 (5th Cir. 2002)).

The scope of the employee's lawsuit is "limited to the 'scope' of the *EEOC investigation* which can reasonably be expected to *grow out of the charge* of the discrimination." *McClain*, 519 F.3d at 274 (citing *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 466 (5th Cir. 1970)) (internal quotation marks omitted) (first emphasis in original, second emphasis added). Because Eleazer's EEOC charge does not check the box for retaliation, mention retaliation, or describe any protected activity that would have provoked retaliation, she did not exhaust her remedies as to her retaliation claims. *See* ROA.176–77; *Horton v. CCA Props. Of Am., LLC,* No. 12-20404, 2013 U.S. App. LEXIS 9358, *17 (5th Cir. May 8, 2013) (dismissing Title VII retaliation claim for failure to exhaust administrative remedies on grounds that plaintiff "did not check the box for retaliation in his EEOC charge, assert that he was demoted or fired as retaliation, or assert having taken any actions that would have provoked retaliation.").

Eleazer does not dispute that her charge does not mention retaliation or protected activity. Eleazer Brief at 12–13. Instead, she

argues that she exhausted her administrative remedies through an unsigned, unverified inquiry form. *Id* (asserting district court did not address her argument that "the EEOC's investigation could reasonably be expected to include a retaliation claim that was asserted *in the EEOC inquiry*…") (emphasis added). Tellingly, she cites no authority that supports this argument.[18]

In fact, this Court has held the opposite. *Ernst v. Methodist Hospital System*, 1 F.4th 333, 338 (5th Cir. 2021). In *Ernst*, the plaintiff's charge alleged only race discrimination, while his intake questionnaire included allegations of sex discrimination and retaliation. *Id.* When he tried to pursue the latter claims in court, the defendant objected to his failure to exhaust his administrative remedies. *Id.* The Court acknowledged that "a claim need not always arise from the EEOC charge *form*," and that "[i]n some circumstances, other documents can serve as a charge." *Id.* at 337. But "EEOC regulations set the standards for Title VII charges." *Id.* Among other things, those regulations require that a

[18] Both *Preston* and *Sanchez* address the investigation that grows out of the *charge*, not out of an inquiry form. *See Preston v. TDFPS*, 222 F. App'x 353, 357 (5th Cir. 2007); *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 465–66 (5th Cir. 1970).

charge be signed and verified; the verification requirement requires the charge to be "sworn to or affirmed before a notary public, designated representative of the [EEOC], or other person duly authorized bylaw to administer oaths . . . or supported by an unsworn declaration in writing under penalty of perjury." *Id.* (citing 29 C.F.R. §§ 1601.3(a) and 1601.9). In *Ernst*, the plaintiff's intake questionnaire was not signed or verified as required. *Id.* at 338. Thus, it could not "be deemed a charge." *Id.* (quoting *Patton v. Jacobs Eng'g Grp., Inc.*, 874 F.3d 437, 443 (5th Cir. 2017)). The same is true for Eleazer's intake questionnaire. It is neither signed nor dated, ROA.253–54, and therefore cannot be deemed a charge. *Ernst*, 1 F.4th at 338. There is no "fact question" for a jury to resolve. *See* Eleazer Brief at 13 (citing *Begolli v. Home Depot U.S.A., Inc.*, 701 F.3d 1158, 1159–61 (7th Cir. 2012) (fact question was what day plaintiff learned he would not be hired, not whether questionnaire could satisfy exhaustion requirements). The questionnaire simply does not meet the standards promulgated by the EEOC or required by this Circuit.

Eleazer also argues that because retaliation is the most frequently alleged basis of discrimination, "it could be reasonably expected that the EEOC would inquire about retaliation in all investigations." Eleazer

Brief at 13. This speculative assumption, unsupported by fact or law, expects too much of the EEOC and would eviscerate the exhaustion requirement for retaliation claims. This argument should be rejected.

Although employment discrimination charges are construed "with the utmost liberality," that is only one of "[t]wo dueling" exhaustion principles. *Preston*, 222 F. App'x at 356. The other principle is that "the charge must contain an adequate factual basis so that it puts the employer on notice of the existence and nature of the charges and so the EEOC may have an 'opportunity to attempt to obtain voluntary compliance.'" *Id.* at 356–57 (quoting *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 467 (5th Cir. 1970)); *see also Ernst*, 1 F.4th at 338–39 ("One of the central purposes of the employment discrimination charge is to put employers on notice of the existence and nature of the charges against them.") (internal quotation marks and citations omitted). Eleazer's *charge* contains no facts that would have put Oracle on notice she was complaining of retaliation. She failed to exhaust her administrative remedies for those claims, and summary judgment was properly granted.

## CONCLUSION AND PRAYER

For all the foregoing reasons, summary judgment was appropriate in Oracle's favor on Eleazer's discrimination and retaliation claims. Oracle requests that the Court affirm the judgment of the district court in its entirety.

Respectfully submitted,

/s/ *Sara E. Janes*
Sara E. Janes
Texas Bar No.24056551
sjanes@weisbartspringer.com
**WEISBART SPRINGER STORM HATCHITT, LLP**
212 Lavaca Street, Suite 200
Austin, Texas 78701
512.652.5780
512.682.2074 fax

Edward M. "Ted" Smith
Texas Bar No. 00791682
tsmith@cornellsmith.com
Sarah E. Lancaster
Texas Bar No. 24092663
slancaster@cornellsmith.com
**CORNELL SMITH MIERL BRUTOCAO BURTON LLP**
1607 WEST AVENUE
AUSTIN, TEXAS 78701
512.328.1540

**ATTORNEYS FOR APPELLEE ORACLE AMERICA, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been forwarded to all counsel of record herein by way of:

- ☐ U.S. Mail, First Class
- ☐ Certified Mail
- ☐ Facsimile
- ☐ Federal Express
- ☐ Hand Delivery
- ☒ ECF (electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants)

on this 12th day of June, 2026, to wit:

Matthew B. Bachop
mbachop@ddollaw.com
DEATS DURST & OWEN, PLLC
2901 Bee Caves Road, Suite L
Austin, Texas 78746
512.474.6200
512.474.7896 fax
mbachop@ddollaw.com

ATTORNEYS FOR APPELLEE

/s/ *Sara E. Janes*
Sara E. Janes

**CERTIFICATE OF COMPLIANCE**

I certify that:

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,181 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because it was prepared in Microsoft Office Word 16 in 14-point, proportionally spaced Century Schoolbook font.

*/s/ Sara E. Janes*
Sara E. Janes